NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

BARBARA FERREIRA,                                          :
                                                          :
                      Plaintiff,            :            Civ. No. 04-1798 (GEB)
                                                          :
          v.                                :            **MEMORANDUM OPINION**
                                                          :
JO ANNE B. BARNHART,                    :
Commissioner of Social Security,            :
                                                          :
                      Defendant.            :
_____                     :

**BROWN, Chief Judge**

This matter comes before the Court upon the appeal of plaintiff Barbara Ferreira

("Plaintiff") from the Commissioner of Social Security's final decision that Plaintiff was not

entitled to supplemental security income under the Social Security Act ("the Act").  This Court,

exercising jurisdiction pursuant to 42 U.S.C. § 405(g), and having considered the parties'

submissions without oral argument pursuant to Federal Rules of Civil Procedure 78, will deny

Plaintiff's appeal.


## I.  BACKGROUND

On or about August 6, 2001, Plaintiff filed an application for disability insurance benefits

under Title II and Part A of Title XVIII of the Act, alleging disability as of June 29, 2001.

(Record ("R.") at 43, 47).  On or about February 13, 2002, the Social Security Administration

("SSA") denied Plaintiff's claim.  (R. at 25-29).  On or about March 11, 2002, Plaintiff filed a

timely request for reconsideration.  (R. at 30).  On or about June 18, 2002, the SSA denied

Plaintiff's request for reconsideration.  (R. at 31-33).   On or about August 7, 2002, Plaintiff filed

a Request for Hearing by Administrative Law Judge ("ALJ").  (R. at 34).  On January 23, 2003,

ALJ Edward J. McNeil conducted a hearing to determine whether Plaintiff was disabled and thus

entitled to benefits.  (See R. at 201-29).

### A.  The Hearing and Objective Medical Evidence

Plaintiff and a vocational expert testified at the hearing.  (R. at 14).  Plaintiff testified

with the assistance of a translator of Portuguese because Plaintiff did not speak English.  (Id.).

Plaintiff testified that she was a fifty-eight year old Portuguese woman who came to the United

States in 1972.  (R. at 202).   Plaintiff further testified that the highest grade she completed was

fourth grade in Portugal.  (R. at 203).   The ALJ heard and viewed evidence relating to the

following impairments:  1) back, neck, and arm pain; 2) headaches; 3) sinuses, allergies and

asthma; 4) depression and insomnia; 5) hypertension; 6) restless leg syndrome; 7)

gastroesophageal reflux disease ("GERD"); and 8) osteoporosis.

#### 1.  Back, Neck, and Arm Pain

Plaintiff asserted that she suffers from pain in her back, the back of her neck, her right

arm, and her right hand.  (R. at 16, 83, 215).  She also claimed that her back pain occasionally

radiates down the back of her legs to her heels and that she has numbness and tingling in her

right hand.  (Id.).  Plaintiff further asserted that her pain interferes with "lifting, carrying,

standing for longer than [fifteen] minutes, walking further than [one] block, [and] prolonged

sitting and grasping."  (R. at 16, 71, 83, 216).  Plaintiff also claimed that she has to lie down at

least twice during the day and that she rarely goes out, but she also admitted that she "prepares

simple meals, does light dusting, watches some television, travels in motor vehicles driven by relatives, occasionally visits relatives and sometimes attends church." (R. at 16, 69-70, 78).

Dr. Bradley, Plaintiff's orthopedist, saw Plaintiff in April 2001 and performed a physical exam. (R. at 119). Dr. Bradley reported that Plaintiff "doesn't have too much tenderness along the spinous processes of the cervical and thoracic area, more along the trapezial muscles and down into the interscapular region." (Id.). Dr. Bradley reported that Plaintiff can flex about forty-five degrees to her left and go a little farther to her right. (Id.). Dr. Bradley reported that Plaintiff's "[s]ensory is intact to light touch in the C5 through T1 distributions." (Id.).

Dr. Bradley x-rayed Plaintiff's cervical spine and diagnosed Plaintiff with "a fair amount of degenerative arthritis." (Id.). Dr. Bradley further stated that Plaintiff has "loss of normal lordosis of the spine . . . some slight narrowing and spondylosis at 4-5 and a lot more collapse at 5-6 and 6-7 with bridging osteophytes almost completely bridging anteriorly, especially at 5-6." (Id.). Dr. Bradley continued, "C7-T1 roughly looks okay. There is some foraminal narrowing around the take-off of C6." (Id.). After an MRI, in June 2001, Dr. Bradley stated that Plaintiff had "some mild pressure with a little right foraminal narrowing at C5-6, but more so with a central to right sided disc/osteophyte mass at C6-7." (R. at 116). Dr. Bradley stated, "[t]here is just mild arthritic changes, things of that nature up and down." (Id.).

Dr. Bradley has treated Plaintiff's back, neck, and arm pain with prescription painkillers. In December 2001, Dr. Bradley noted that Plaintiff's condition was improving on increased-strength Celebrex. (R. at 169). On October, 17, 2002, Dr. Bradley noted that Plaintiff had switched to Relafen to treat her back and extremity pain. (R. at 196). Dr. Bradley further noted that Relafen was more effective for Plaintiff than Celebrex, but that the pain continued. (Id.). In

January 2003, Plaintiff complained to Dr. Bradley that she had not found a dose that works without upsetting her stomach.  (R. at 16, 196).  Dr. Bradley suggested that Plaintiff see a gastroenterologist to discuss other options, but Plaintiff did not submit evidence to the ALJ showing that she followed that advice.  (Id.).  Plaintiff was only taking over-the-counter Tylenol at the time of the hearing for this pain.  (R. at 16, 89, 209).  In all of the reported visits, Dr. Bradley suggested epidural injections for diagnostic and therapeutic purposes, but Plaintiff never heeded this suggestion because of apprehension and because she needed to arrange insurance as hers had just expired.  (R. at 16, 169, 196).

Plaintiff also reported that she had carpal tunnel repairs performed on both of her hands in 1996.  (R. at 186).  The ALJ noted that Plaintiff had the carpal tunnel procedures approximately five years before she stopped working.  (R. at 16).  In April 2001, Plaintiff complained to Dr. Bradley of pain on the right side of her neck that goes down to her shoulder blade and of some numbness and tingling going from her right elbow down along the ulnar border to her little and ring fingers.  (R. at 16, 120).  Dr. Bradley examined Plaintiff in April 2001 and stated that Plaintiff "moves both her upper extremities fully and actively.  Her motor exam is 5/5 in each arm."  (R. at 119).

Dr. Vekhnis, in a June 2002 physical exam of Plaintiff, diagnosed a positive Tinel's sign at Plaintiff's right elbow.  (R. at 186).  Dr. Vekhnis noted Plaintiff's carpal tunnel repair scars, but reported that Plaintiff had normal grip and pinch strength, full range of motion in both shoulders, elbows, wrists, and hands, that her sensory examination was normal, and that her deep tendon reflexes were brisk.  (Id.).  Dr. Vekhnis further stated that Plaintiff has "normal function of both upper extremities for fine and gross motor manipulations."  (R. at 187).  In January 2003,

4

Dr. Bradley stated that the elbow and hand pain reflect "a little bit of ulnar nerve compression . . . ."  (R. at 196).  Dr. Bradley's only recommendation was to splint the elbow so that she could "sleep a little better."  (Id.).

### 2.  Headaches

Plaintiff reported that she has been getting severe, throbbing headaches every day for many years.  (R. at 17, 76).  Plaintiff stated that the headaches are associated with variable intensities of pain, dizziness, lightheadedness, blurry vision, and nausea.  (Id.).  Plaintiff stated that her headaches prevent her from concentrating on her work.  (Id.).

In July 2001, Plaintiff's neurologist, Dr. Mendelson, noted that he was not able to identify the cause of Plaintiff's headaches.  (R. at 166).  In August 2001, Plaintiff's primary care physician, Dr. Colaco, noted that Plaintiff has a history of migraine headaches.  (R. at 158).  The record does not contain any objective findings that suggest a headache disorder other than migraines.  (R. at 17).

To control her headaches, Dr. Mendelson has treated Plaintiff with butalbital/Fioricet and nortriptyline.  (R. at 17, 165-66, 198).  The former is a potent barbiturate that contains analgesic medication and the latter is a tricyclic antidepressant.  (R. at 17).  At the hearing, Plaintiff testified that her headache medications cause drowsiness and stated that the medicines cause frequent bowel movements.  (R. at 82, 216).  Plaintiff also stated that as of August 15, 2001, she had been taking "Butal" for at least two years and that she stopped working as a seamstress on June 29, 2001.  (R. at 82).  Therefore, Plaintiff was working while suffering from and being treated for her headache disorder for nearly two years.  (R. at 47, 82).

There were substantial discrepancies between Plaintiff's written reports to the SSA and her treating physicians' reports regarding her headache disorder.  (R. at 17).  Specifically, on August 15, 2001, Plaintiff submitted to the SSA that she took Butal/Fioricet every eight hours and that she took at least two pills per day.  (R. at 82).  Plaintiff submitted that the medication only sometimes relieves the pain.  (Id.).  Plaintiff also submitted to the SSA that she took the nortriptyline daily at bedtime.  (Id.).  Plaintiff reported that nortriptyline only sometimes relieves her headache pain, and that it makes her drowsy and causes frequent bowel movements.  (Id.).

On October 12, 2001, Plaintiff's neurologist, Dr. Mendelson, reported that Plaintiff has been using nortriptyline 20 mg. at bedtime with "excellent results" and that with that dosage she has "virtually no headaches at all."  (R. at 165).  Dr. Mendelson also reported that on her first month with the nortriptyline she only had to take Fioricet twice and that on the 20 mg. dose "she has no side effects at all."  (Id.).  Dr. Mendelson summarized that "the patient's headaches are well managed on nortriptyline."  (Id.).  Plaintiff had a follow-up visit with Dr. Mendelson on January 15, 2002, where Dr. Mendelson reported that Plaintiff's "headaches are rather well controlled on just 20 mg. nortriptyline" and that he was "making no new recommendations regarding headache management since the patient's headaches are under very good control on her present medicines."  (Id.).  Plaintiff had a follow-up visit with Dr. Mendelson on July 16, 2002, after which he reported that "[o]n nortriptyline 20 mg. at bedtime, she is very nearly headache free [and] requir[es] generic Fioricet just once weekly."  (R. at 198).  Dr. Mendelson further reported that Plaintiff "has no side effects."  (Id.).

### 3.  Sinuses, Allergies and Asthma

Plaintiff reported that she suffers from severe sinus pain and sneezing, both of which get worse during exposure to dust and fumes.  (R. at 18).  Plaintiff underwent endoscopic sinus surgery in October 2000 for allergic type nasal and sinus polyps with follow-up endoscopic sinus cavity debridements over the next couple of months.  (Id.).  Plaintiff's next documented sinus problem arose on June 29, 2001 when she developed severe pain in her face and head.  (Id.).  On July 7, 2001, doctors at St. Barnabas Medical Center examined Plaintiff and diagnosed her with pansinusitis and recurrent nasal polyps after a CT scan.  (R. at 18, 121-152).  Plaintiff was hospitalized and treated with intravenous antibiotics and endoscopic sinus surgery.  (R. at 121-152).  St. Barnabas Medical Center discharged Plaintiff on July 9, 2001.  (Id.).  Plaintiff has not reported any further episodes of sinus pain.  (R. at 18).

In August 2001, Plaintiff reported to the SSA that her primary care physician, Dr. Colaco, prescribed Flonase nasal spray that provided temporary relief for her allergies.  (R. at 18, 52, 86).  Dr. Colaco suggested that Plaintiff consult with an allergist because she was suffering from itching and tearing of the eyes, as well as nasal congestion, sneezing, and nasal bleeding.  (R. at 18, 179).

Plaintiff saw Dr. Bukosky, an allergist, on August 30, 2001.  (R. at 18, 180).  Dr. Bukosky specifically checked for nasal polyps and did not see any.  (Id.).  Dr. Bukosky further reported that Plaintiff did not have any sinus area tenderness.  (Id.).  Dr. Bukosky attributed her symptoms to allergic rhinitis, but did not make any abnormal findings.  (R. at 18, 181).  Dr. Bukosky reported that Plaintiff claimed to have been suffering from allergy-like problems for over twenty-five years and had been treated with allergy shots over twenty-five years prior to her

visit.  (R. at 179).  Plaintiff further reported to Dr. Bukosky that suffering from allergy symptoms

had not interfered with her overall life.  (Id.).

Dr. Bukosky and Dr. Colaco have also noted that Plaintiff has a history of asthma.  (R. at

158, 179).  Plaintiff controls this condition well and has never been hospitalized for asthma.  (R.

at 18, 158, 179).

In August 2001, Dr. Bukosky stated that Plaintiff was getting control of these conditions

with Serevent, Flovent, and Flonase, and that he wanted her to continue with those medications.

(R. at 181).  Dr. Bukosky saw Plaintiff for a follow-up on September 13, 2001.  (R. at 182).  Dr.

Bukosky reviewed Plaintiff's pulmonary function testing and diagnosed her with mild-persistent

asthma and perennial allergic rhinitis.  (Id.).  Dr. Bukosky reported that Plaintiff was "doing

nicely and [that he was] making no changes in medication, at least for now," though he did note

that Plaintiff did have a thick post-nasal drip at times.  (Id.).

Plaintiff saw Dr. Berg, an ear, nose, and throat specialist, on October 16, 2001 after a

nosebleed.  (R. at 18, 175).  Dr. Berg was "able to control [the bleeding] with silver nitrate

cautery."  (R. at 175).  Dr. Berg replaced the Flonase with Rhinocort nasal spray or Claritin to

prevent further bleeding.  (Id.).  As of April 11, 2002, Plaintiff had not seen Dr. Berg again and

had switched back to Flonase at the time of the hearing.  (R. at 18, 175).

### 4.  Depression and Insomnia

Plaintiff's neurologist, Dr. Mendelson, reported that Plaintiff complained of insomnia in

January 2002.  (R at 18, 165).  In the same report, Dr. Mendelson reported that Plaintiff also

"appeared somewhat depressed."  (Id.).  Dr. Mendelson prescribed Ambien use as needed.  (Id.).

Plaintiff visited Dr. Mendelson for a follow-up on July 16, 2002, where he noted that she no

longer seemed to need the Ambien and that she "is suffering much less difficulty with sleep."
(R. at 18, 198).  Dr. Mendelson suggested that Plaintiff see her primary care physician to
determine whether depression was causing her symptoms of fatiguability and that she report to
Dr. Mendelson in six months.  (R. at 18, 198).  It appears that Plaintiff did not return to Dr.
Mendelson for her follow-up nor did she have her mental health examined by any other
physician.  (R. at 18).

Plaintiff testified at the hearing that she had been taking Paxil in the past, but her list of
medication submitted before the hearing does not list Paxil.  (R. at 89, 210).  Furthermore, none
of Plaintiff's physicians has reported prescribing Paxil to Plaintiff.  Plaintiff has not claimed that
her mental problems contributed to her inability to work.  (R. at 18-19).

### 5.  Hypertension

In his August 13, 2001 report, Dr. Colaco, Plaintiff's primary care physician, indicated
that Plaintiff has a medical history of high blood pressure that she treats with Tenoretic.  (R. at
18, 157).  Dr. Colaco failed to mention high blood pressure in his April 12, 2002 report of
Plaintif's medical history.  (R. at 177).

### 6.  Restless Leg Syndrome

Based on Plaintiff's complaints, Dr. Mendelson, diagnosed Plaintiff with probable
restless leg syndrome in January 2002.  (R. at 19, 165).  Dr. Mendelson prescribed Mirapex to
treat this condition.  (R. at 165).  Plaintiff saw Dr. Mendelson again on July 16, 2002.  (R. at 19,
198).  Dr. Mendelson reported that Plaintiff got a good response using Mirapex for restless leg
syndrome, except she complained that it upset her stomach when taken without food.  (Id.).  Dr.

Mendelson reported that it was his impression "that the restless legs is less of a problem now than it was before . . . ." (Id.).

### 7.  GERD

Plaintiff alleges that she suffers from GERD.  (R. at 89).  Plaintiff's submission of her recent medial treatment before the ALJ hearing listed three visits to a gastroenterologist, Dr. Greenblatt.  (R. at 68, 88).  Plaintiff further submitted that she was taking Nexium that was prescribed by Dr. Greenblatt for GERD.  (R. at 88-89).  Plaintiff has not submitted any medical records from Dr. Greenblatt into evidence.  Only Dr. Bradley referenced that Plaintiff had been seeing Dr. Greenblatt for her gastrointestinal complaints in his January 10, 2003 office visit report.  (R. at 196).  Plaintiff's allergist, in the patient history, reported that Plaintiff has an enlarged pancreas that was diagnosed after x-rays of the abdomen, but that gastroenterology evaluations were negative and that Plaintiff was diagnosed with some gastritis with an unclear cause.  (R. at 180).  The ALJ noted that Plaintiff's primary care physician has not reported any GERD diagnosis and that Plaintiff has not alleged that her stomach ailment directly affects her ability to perform work related activities.  (R. at 19, 157, 177).

### 8.  Osteoporosis

Plaintiff has osteoporosis.  (R. at 19, 170).  Her orthopedist, Dr. Bradley, diagnosed this condition after administering a bone density exam in November 2001.  (Id.).  Dr. Bradley prescribed Fosamax and suggested that Plaintiff take between 1200 and 1500 mg of calcium daily.  (R. at 170).  The ALJ noted that osteoporosis places Plaintiff at a greater than average risk for fractures, but that she has not sustained any fractures and does not suggest that the osteoporosis is contributing to her complaints.  (R. at 19).

10

B.  The Decision

The ALJ analyzed the evidence presented in accordance with the five-step process set forth in 20 C.F.R. § 404.1520.  After reviewing the entire record and discussing all of Plaintiff's impairments, the ALJ found that Plaintiff was not disabled because her residual function capacity ("RFC") permitted her to return to her past relevant work as a seamstress, thus ending the five-step process at step four.  In the fourth step, the ALJ had to consider limiting effects of all impairments, including both severe and non-severe impairments.  20 C.F.R. § 404.1545(e).  The ALJ summarized and discussed those impairments listed above before making his findings.

The ALJ noted that Plaintiff's primary care physician, Dr. Colaco, stated that Plaintiff was unable to work because of recurrent dizziness, neck pain, and back pain in August 2001, and because of neck and back pain in April 2002.  (R. at 19, 158, 177).  The ALJ further noted that Dr. Colaco did not cite objective support beyond the fact that Plaintiff had arthritis and meningitis, and had undergone carpel tunnel repairs on both hands.  (R. at 19).  The ALJ found that that Dr. Colaco's opinions were not very consistent with the weight of other evidence in the record pertaining to Plaintiff's subjective functioning.  (Id.).

The ALJ used the opinions of the Disability Determination Service ("DDS") doctors who participated in prior adjudications of Plaintiff's claim of disability to support his RFC determination.  The ALJ noted that the DDS doctors "opined that the claimant had degenerative changes and foraminal narrowing in her cervical spine, degenerative changes in her lower spine with disc bulging, a history of meningitis, hypertension and headaches."  (R. at 20, 188-195).  The ALJ further noted that the DDS doctors believed that Plaintiff's complaints of impairments were not fully consistent with the other medical evidence in the record.  (R. at 20, 193).  The

DDS doctors determined that Plaintiff's RFC was that she could lift and/or carry up to twenty pounds occasionally and lift and/or carry ten pounds frequently.  (R. at 20, 189).  The DDS doctors further determined that Plaintiff could stand, sit, and/or walk, with normal breaks, for a total of about six hours of an eight-hour workday.  (R. at 20, 189).  The DDS doctors further determined that while Plaintiff was sitting, she could push and pull commensurately with her lifting and carrying abilities and that she could climb and balance occasionally and perform all other physical work-related activities.  (R. at 20, 189-190).   The DDS doctors supported their conclusions by noting that Plaintiff has "mildly [degenerative] c-spine [range of motion and] full active [range of motion] of [her] upper extremities" and that she scored a 5/5 on her motor strength exam.  (R. at 189).  The DDS doctors further noted that Plaintiff has "no sensory defects."  (Id.).

The ALJ acknowledged that the DDS doctors did not meet or examine the Plaintiff, but nonetheless decided to give their opinions substantial weight because of their degree of professional experience, training, and impartiality, and because "[t]hey supported their opinions with references to objective evidence in the record."  (R. at 20).  The ALJ further noted that the bulk of the evidence concerning impairments not addressed by the DDS doctors was consistent their opinions.  (Id.).

Before stating his findings, the ALJ noted that the vocational expert testified at the hearing that Plaintiff's past relevant work as a seamstress only involved light exertion as generally performed in the national economy.  (R. at 20, 218).  The ALJ then stated "[t]he

12

claimant is able to sustain substantially the full range of 'light'[1] occupations," including her past relevant work as a seamstress, and therefore found that she is not disabled.  (R. at 20).

## II. DISCUSSION

### A.  Standard of Review for Social Security Appeals

The Commissioner's decisions as to questions of fact are conclusive before a reviewing court if they are supported by "substantial evidence in the record."  42 U.S.C. § 405(g); Knepp v. Apfel, 204 F.3d 78, 83 (3d. Cir. 2000).  "Substantial evidence" means more than "a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate." Plummer v. Apfel, 186 F.3d 422, 427 (3d. Cir 1999) (quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995)).  If the ALJ's finding of fact are supported by substantial evidence, this Court is bound by those findings, "even if [it] would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)).

The Third Circuit has made it clear "that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence."  Kent v Schweiker, 710 F.2d 110, 114 (3d Cir 1983).  The ALJ must

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm and leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 C.F.R. § 404.1567(b).

analyze all the evidence and explain the weight he has given to probative exhibits.  Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (internal citations omitted).  As the Third Circuit has held, access to the ALJ's reasoning is indeed essential to a meaningful court review.  Fargnoli, 247 F.3d at 42.  Nevertheless, the district court is not "empowered to weigh the evidence or substitute is conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).


   B.  Standard for Awarding Benefits

   A plaintiff may not receive benefits under the Act unless he or she first meets statutory insured status requirement.  A plaintiff must be disabled, which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is not under a disability unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives or whether a specific job vacancy exists in the immediate area in which he lives or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A).

   Regulations promulgated under the Act establish a five-step process for an ALJ's evaluation of a claimant's disability.  20 C.F.R. § 404.1520.  In the first step, the ALJ must

determine whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is working and the work is a substantial gainful activity, his application for disability benefits is automatically denied.  Id.  If the claimant is not employed, the ALJ proceeds to step two and determines whether the claimant has a "severe impairment" or "combination of impairments."   20 C.F.R. § 404.1530(a)(4)(ii).  A claimant who does not have a "severe impairment" is not disabled.  Id.  Third, if the impairment is found to be severe, the ALJ determines whether the impairment meets or is equal to those impairments listed in Appendix 1 of this subpart ("the Listing").  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is conclusively presumed presumed to be disabled, and the evaluation ends.  Id.; 20 C.F.R. § 404.1520(d).

If it is determined that the impairment does not meet or equal a listed impairment, the ALJ proceeds to step four, which requires a determination of: (1) the claimant's capabilities despite limitations imposed by an impairment (the claimant's RFC); and (2) whether those limitations prevent the claimant from returning to work performed in the past ("past relevant work").  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant is found capable of performing his previous work, the claimant is not disabled.  Id.  If the claimant is not longer able to perform his prior line of work, the evaluation must continue to the last step.  The fifth step requires a determination of whether the claimant is capable of adjusting to other work available in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).  The ALJ must consider the RFC assessment, together with claimant's age, education and past work experience.  20 C.F.R. § 404.1520(g).  Thus, entitlement to benefits turns on a finding that the claimant is incapable of performing her past work or some other work in the national economy because of her impairments.

The application of these standards involves shifting burdens of proof.  The claimant has the burden of demonstrating both steps one and two, i.e., an absence of present employment and the existence of medically sever impairment.  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987).  If the claimant is unable to meet this burden, the process ends and the claimant does not receive benefits.  <u>Id.</u>  If the claimant carries her burdens and demonstrates that the impairments meet or equal those within the Listing, claimant has satisfied her burden of proof and is automatically entitled to benefits.  <u>Id.</u>  If the claimant is not conclusively disabled under the criteria set for the Listing, step three is not satisfied, and the claimant must prove "at step four that the impairment prevents her from performing her past work."  <u>Id.</u>  Thus, it is the claimant's duty to offer evidence of the physical and mental demands of past work and explain why she is unable to perform such work.  If the claimant meets this burden, the burden of proof then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy."  <u>Id.</u>  The step five analysis "can be quite fact specific."  <u>Burnett v Commissioner</u>, 220 F.3d 112, 126 (3d Cir. 2000).


<u>C.  The ALJ's Decision Was Based Upon Substantial Evidence in the Record</u>

Plaintiff makes three arguments in claiming that the ALJ's decision was not based on substantial evidence.  Plaintiff argues that:  1) the ALJ did not articulate the basis for his finding of non-disability; 2) the ALJ impermissibly omitted a large portion of the vocational expert's testimony; and 3) because another ALJ found Plaintiff to be disabled at a later hearing, this case must be remanded for the sole purpose of awarding benefits.  (Pl.'s Br. at 13, 14, 17).

<u>1.  The ALJ Articulated the Basis for His Finding of Non-Disability</u>

Plaintiff argues that the ALJ failed to articulate the evidentiary basis of his finding that Plaintiff retained the RFC to perform light work.  (Pl.'s Br. at 10).  Plaintiff argues that the ALJ "completely rejected the reports of [Plaintiff's] treating physicians," and that the only evidence relied on were the "check-off forms" filled out by the DDS doctors in the course of their RFC analysis.  (Pl.'s Br. at 9).  Plaintiff misstates the issue.  The issue is not whether the physicians agree with the ALJ's conclusion of law that Plaintiff is not disabled and may sustain her past relevant work.  It is whether this conclusion of law was based upon substantial evidence in the record.  <u>See</u> 20 C.F.R. § 404.1527(e)(1) (stating that a statement by a medical source that a claimant is "disabled" or "unable to work" does not necessitate a finding of disability).

Plaintiff bears the burden to establish the first four steps of the five-step analysis. <u>Yuckert</u>, 482 U.S. at 146 n.5.  Plaintiff has not met her burden as to the fourth step.  The ALJ found that Plaintiff suffered from the impairments discussed above, but concluded that none of these conditions prevented Plaintiff from sustaining her past relevant work.  The Court is able to discern the following specific arguments from Plaintiff's brief:  a) the ALJ did not adequately explain how Plaintiff may return to work as a seamstress in light of her back pain; b) the ALJ did not adequately explain how Plaintiff may return to work as a seamstress in light of her wrist and elbow impairments; and c) the ALJ did not adequately explain how Plaintiff could get hired as a seamstress in light of her impairments.  (Pl.'s Br. at 12, 16).

a) Back Impairment

Plaintiff argues that the ALJ did not adequately explain how Plaintiff is capable of sitting eight hours a day and operating a sewing machine with pedals despite her alleged back

impairment.  (Pl.'s Br. at 12).  Plaintiff mischaracterizes the ALJ's finding.  The ALJ found that

Plaintiff could sit for about six hours a day with normal breaks while pushing and pulling

commensurately with her ability to carry up to ten pounds frequently and twenty pounds

occasionally.  (R. at 21).  The ALJ found that Plaintiff suffers from "severe" cervical and

lumbosacral spine impairments that do not rise to the level of a *per se* disabling impairment

listed in 20 C.F.R. § 404, Subpt. P, App. 1.  (R. at 20).  Plaintiff does not contest this finding.

Plaintiff instead argues that these conditions prevent her from working in her past relevant work,

contrary to the ALJ's finding.  (Pl.'s Br. at 12).

There is substantial evidence in the record that indicates that Plaintiff is able to sit and

ambulate as required to do "light work."  An examination of the entire record reveals that in June

2002, Dr. Vekhnis performed a full physical examination of Plaintiff.  (R. at 186).  Dr. Vekhnis

reported that Plaintiff could mount and dismount the examination desk without assistance.  (Id.).

Dr. Vekhnis stated that an examination of Plaintiff's cervical spine showed no vertebral

tenderness and no paraspinal muscle spasm.  (Id.).  Dr. Vekhnis stated that Plaintiff's "forward

flexion was full."  (Id.).  Dr. Vekhnis stated that an exam of Plaintiff's lumbar and dorsal spine

"revealed tenderness . . . in [the] lower lumbar region."  (Id.).  Dr. Vekhnis stated that Plaintiff's

range of motion was near normal.  (Id.).

Plaintiff argues that even if she has full range of motion for sitting and ambulating, she is

unable to perform those activities because of her pain.  There is substantial evidence in the

record, however, showing that Plaintiff's pain does not limit her functional capacity to sit and to

ambulate.  In December 2001, Dr. Bradley noted that Plaintiff's condition was improving on

increased-strength Celebrex.  (R. at 169).  On October, 17, 2002, Dr. Bradley noted that Plaintiff

had switched to Relafen to treat her back and extremity pain, and that it was more effective than Celebrex.  (R. at 196).  In January 2003, Plaintiff complained to Dr. Bradley that she had not found a dose that works without upsetting her stomach.  (R. at 16, 196).  Dr. Bradley suggested that Plaintiff see a gastroenterologist to discuss other options, but there is no evidence showing that she did so.  (Id.).  At the hearing, only a few weeks after Plaintiff's last reported visit with Dr. Bradley, she had switched to over-the-counter Tylenol in place of her prescription Relafen.  (R. at 16, 89, 209).  In all of the reported visits, Dr. Bradley suggested epidural injections to help relieve Plaintiff of the side effects of her prescription pain medication, but not because those medications were ineffective in alleviating her pain.  (R. at 16, 169, 196).

Plaintiff notably fails to cite to any medical evidence in the record that contradicts Dr. Vekhnis' report.  That report, discussed above, supports the ALJ's finding that despite Plaintiff's back problems, she has the residual functional capacity for "lifting and/or carrying up to 20 pounds occasionally, lifting and/or carrying up to 10 pounds frequently, standing and/or walking (with normal breaks) for a total of about six hours of an eight-hour workday, sitting (with normal breaks) for a total [of] about six hours of an eight-hour workday, [and] pushing and pulling commensurately with her lifting/carrying capabilities . . . ."  (R. at 21.)

### b) Wrist Impairment

Plaintiff further argues that the ALJ did not adequately explain why Plaintiff's elbow and wrist impairments do not prevent her from performing her past relevant work.  (Pl.'s Br. at 12).  The Court notes that Plaintiff claims in her brief that both of her wrists are bandaged and braced, but does not point to any evidence in the record to support this contention.  (Id.).  Plaintiff questions how a person who had carpal tunnel syndrome could possibly return to the activity that

19

caused the impairment.  (Id.).  Plaintiff herself established, however, that it is possible for her to
return to work after her carpal tunnel repairs – she worked for five years after her surgery before
claiming she was disabled.  (R. at 16, 214).

The ALJ referenced the report of Dr. Vekhnis, who examined Plaintiff on June 6, 2002,
to establish Plaintiff's elbow impairment.  (R. at 16).  Dr. Vekhnis reported that Plaintiff does
have a positive Tinel sign at her right elbow and noted the carpal tunnel history, but after
examining Plaintiff, Dr. Vekhnis reported that Plaintiff has full range of motion in both
shoulders, elbows, wrists, and hands, and normal grip and pinch strength.  (R. at 185-86).

Dr. Bradley, Plaintiff's orthopedist, saw Plaintiff in January 2003 and noted that Plaintiff
has the elbow impairment discussed above, but his only recommendation was to wrap the elbow
so Plaintiff could sleep better.  (R. at 196).  When Dr. Bradley first saw Plaintiff in April 2001,
he noted her medical history and reported that Plaintiff moves both upper extremities fully and
actively and that she scored a 5/5 on her motor exam in each arm.  (R. at 119).  Therefore, the
ALJ's finding that Plaintiff's elbow and wrist impairments would not prevent her from working
as a seamstress was based on substantial evidence in the record.

c) Hiring Prospects

Plaintiff next argues that the ALJ did not explain how Plaintiff could return to her past
relevant work as a seamstress.  (Pl.'s Br. at 16).  Plaintiff argues that even if she could operate a
sewing machine, she could not do so at the "speed/rate/production requirements of competitive
textile employment."  (Id.).  Plaintiff's ability to get hired, however, is not relevant.  Plaintiff is
disabled only if her impairments are of such severity that she is unable to do her previous work,
"regardless of whether such work exists in the immediate area in which [s]he lives, or whether a

20

specific job vacancy exists for [her], **or whether [s]he would be hired if [s]he applied for work**." 42 U.S.C. § 423(d)(2)(A) (emphasis added).  The ALJ found that Plaintiff's past relevant work does not require activities precluded by Plaintiff's RFC.  (R. at 21).  A vocational expert testified at the hearing and stated that if Plaintiff "could do light work she could return to her work as a sewing machine operator." (R. at 218).  Plaintiff's statements in her "Work History Report" support this classification.  Plaintiff reported that she worked sitting for eight hours a day and that the heaviest weight she lifted was less than ten pounds.  (R. at 74).  This work falls within the parameters of "light work" as defined above.

### 2.  The ALJ Properly Omitted Much of the Vocational Expert's Testimony

Plaintiff's next argument is that the ALJ improperly omitted much of the vocational expert's testimony.  (Pl.'s Br. at 17).  Plaintiff essentially argues that the ALJ omitted portions of the vocational expert's testimony that indicated Plaintiff could not perform her past relevant work because of her multiple alleged impairments and because of her medication.  (Pl.'s Br. at 21).  This testimony was not relevant because the ALJ determined that the functional restrictions caused by Plaintiff's impairments were not as she had alleged.  Plaintiff argues that the ALJ impermissibly omitted testimony by the vocational expert relating to the following issues:  a) Plaintiff's restless leg syndrome; b) Plaintiff's surgically repaired wrists; c) that Plaintiff takes Butalbital, Fioricet, and Barbiturates for her headaches; and d) that Plaintiff takes Nortriptyline, Ambien, and Paxil to fall asleep.  (Id.).

### a) Restless Leg Syndrome

Plaintiff states "[t]here is no contraction [*sic*] to the absolute fact that [P]laintiff has 'lazy leg syndrome.'" (Id.).  Although Plaintiff may have restless leg syndrome, the ALJ discussed

Plaintiff's restless leg syndrome and noted that in July 2002, Dr. Mendelson reported that

Plaintiff got a good response from her medication for restless leg syndrome, except for stomach

problems when taken without food.  (R. at 198).

### b) Surgically Repaired Wrists

Plaintiff then states that "[t]here is no contradiction to the fact that [P]laintiff suffers from

two surgically repaired wrists."  (Pl.'s Br. at 21).  While this statement is true, Plaintiff worked as

a seamstress for five years after her wrist surgery.  (R. at 16, 186); see also supra (II)(C)(1)(b).

### c) Butalbital, Fioricet, and Barbiturates

Plaintiff next states "[t]here is no contradiction to the fact that [P]laintiff continues to take

heavy-duty pain medication in the form of Butalbital, Fioricet, Barbiturates causing lethargy,

drowsiness and dizziness."  (Pl.'s Br. at 21).  Plaintiff took these medications for pain relief from

her headaches.  (R. at 17, 81-82, 89, 158.)  Plaintiff reported that Dr. Colaco prescribed "Butal"

nearly two years before she stopped working and that she took it at least twice per day.  (R. at 82,

89).  Furthermore, Dr. Colaco reported that Plaintiff only took Fioricet "on and off" in August

2001.  (R. at 158).  Plaintiff's neurologist, Dr. Mendelson, reported that Plaintiff only required

Fioricet twice a month in October 2001, and once weekly in July 2002.  (R. at 165, 198).  In July

2002, Dr. Mendelson stated that Plaintiff "has no side effects" from her headache medication.

(R. at 198).  There is thus substantial evidence supporting the ALJ's finding that "[t]he

claimant's medically determinable impairments do not prevent the claimant from performing her

past relevant work."  (R. at 21.)

d) Nortriptyline, Ambien, and Paxil

Plaintiff lastly states that she "takes Nortriptyline, a known sleep agent, as well as Ambien, Paxil and many other fatigue/sleep inducing medications in order to combat pain." (Id.).  Dr. Mendelson's statement that Plaintiff has no side effects caused by her headache medication specifically referred to the Nortriptyline as well.  (R. at 198).  In the same report, Dr. Mendelson stated that Plaintiff no longer needed Ambien and was suffering much less with sleep.  (Id.).  At the hearing, Plaintiff testified that she no longer was taking Paxil.  (R. at 210). Therefore, the ALJ's finding that the Nortriptyline, Ambien, and Paxil do not affect Plaintiff's functionality as she alleged is supported by substantial evidence.

The ALJ's determination that Plaintiff's impairments and medications did not cause the functional limitations alleged by Plaintiff was based on substantial evidence in the record. Moreover, the ALJ did not err in omitting the vocational expert's testimony relating to how such alleged impairments and medical side effects would affect Plaintiff's ability to work.

### 3.  The Decision by a Different ALJ Has No Bearing on this Case

Plaintiff next submits that a different ALJ, Dennis O'Leary, found Plaintiff to be disabled as of June 29, 2001, after a hearing on September 23, 2004.  (Pl.'s Br. at 13).  Plaintiff states in her brief that the second decision was based on the same evidence presented to ALJ McNeil. (Id.).  Plaintiff argues that the subsequent decision by ALJ O'Leary necessitates that this Court remand this matter for the sole purpose of awarding benefits.  (Id.).  This argument lacks merit. Plaintiff inaccurately states that ALJ O'Leary "found, on the basis of exactly the same evidence, that [P]laintiff was totally and permanently disabled since . . . June 29, 2001."  (Id.).  A cursory glance at the "List of Exhibits" attached to ALJ O'Leary's favorable decision indicates that much

of the evidence that he considered was not submitted or did not exist at the time of the hearing

that led to this appeal.  For example, Plaintiff submitted the following evidence that was not

submitted in this matter:  medical records from Dr. Robert Greenblatt; an internal medicine

consultative examination from Dr. Sreedevi Menon; medical records from Dr. Colaco dated after

the hearing before ALJ McNeil; and a psychiatric examination by Dr. Alan Dubro dated after the

hearing before ALJ McNeil.  (See App. to Pl.'s Br.).  ALJ O'Leary based his decision on

different evidence than the evidence presented to ALJ McNeil and this Court.  Evidence that was

not before the ALJ "cannot be used to argue that the ALJ's decision was not supported by

'substantial evidence.'"  Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991).


## III.  CONCLUSION

For the reasons states herein, Plaintiff's appeal is denied.  An appropriate form of order

accompanies this Memorandum Opinion.


Dated:  August 10, 2006

　　　　　　　　　　　　　　　　　     s/ Garrett E. Brown, Jr.
　　　　　　　　　　　　　　　　　GARRETT E. BROWN, JR., U.S.D.J.

24